MAY QUEEN, The (MERRIMAN v.). See Case No. 9,481.

## Case No. 9,361.

MAYSHEW et al. v. TERRY.

FRANKLIN v. SAME.

[1 Spr. 584.] [1]

District Court, D. Massachusetts. Feb., 1861.

SEAMEN—WAGES—DISCHARGE—SHIPPING ARTICLES —WHALING VOYAGE—NOVEL PROVISIONS —SHARE.

1. A seaman, during a sea-elephant voyage, was discharged abroad, and received from the master a written order, directing the owner to pay him his share of all the proceeds of the voyage: *Held*, that reference was to be had to the shipping articles, not only to ascertain the lay set against the name of the seaman, but also the mode of computation, by which the amount of his share was to be determined.

2. During such voyage, the seaman agreed to take his discharge, and to enter into the service of another ship, but he being wholly in the power of the master, and not allowed the option of completing his first voyage, *held*, that he was not bound by the terms of the discharge, or of his new shipment, as to the rate of his compensation.

3. In such case, the seaman is entitled to a quantum meruit, for the whole time of his service, for both ships, to be apportioned between them.

4. The shipping articles were in the usual printed form for whaling voyages, with an additional clause in writing, containing novel provisions as to the mode of computing the shares of the seamen: *Held*, that the seaman was not bound by such new provisions, they not having been made known to him at the time of the shipment.

In admiralty.

E. L. Barney, for libellants.
A. S. Cushman, for respondents.

SPRAGUE, District Judge. These two libels, against the owner of the ship Samuel Robertson and the ship Arab, have been heard together. They are brought to recover compensation for services rendered in two sea-elephant voyages. In the summer of 1856, the ship Samuel Robertson sailed from Fairhaven, with a small schooner, as a tender, bound for the South Pacific Ocean, for the purpose of taking sea-elephant oil, at Desolation Isle. The schooner was lost, and the enterprise could not be prosecuted, without another tender. There was no harbor, or other place, where the ship could lie, within a hundred miles of Desolation Isle. The tender was used for the purpose of killing the animals at the island, and conveying the blubber, or oil, to the ship. Another schooner, called the Oxford, sailed from Fairhaven on the 17th day of July, 1857, to take the place of the tender, which had been lost. On her passage, she put into Fayal, and there, on the 5th day of August, 1857, the libellants were shipped. They were natives of that island, and had always resided there, and were ignorant of the English language. They signed the

[1] [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

shipping articles, which had been made at Fairhaven, and were the usual printed articles for a whaling voyage, with the addition of a written clause, adapted to the novel and peculiar character of this voyage. Their lay, as entered against their names, was one two-hundredth; but the written clause provided that the Oxford was to be a tender to the Samuel Robertson; that the lay should be calculated on only seventy per cent. of the proceeds of that ship's voyage; and that they should have only such part of their lay, as the time they served was of the whole time of the Samuel Robertson's voyage. There is no proof that this new clause was read or explained to these libellants; the evidence, at most, only shows that they were informed that the Oxford was to be a tender to the ship, and that they were to have a two-hundredth lay of the ship's voyage.

The Oxford, with the libellants on board, arrived in due time at Desolation Isle; and the libellants, with others of the crews of the Oxford and the Samuel Robertson, continued to serve, on shore and on board of the schooner, until the ship was filled with oil, which was in May, 1858.

It was the purpose of the master of the ship, to leave the Oxford at the island, with an adequate crew, to continue the killing of the sea-elephants, and securing their oil, while the Samuel Robertson should make a voyage to the United States and return, or send out another ship in her stead.

The libellants were among those who remained; and on the 10th of May, 1858, they signed articles for the ship that should be sent out, at a one-hundred-and-forty-fifth lay; and at the same time, each of the libellants received from the master an order on the owner of the Samuel Robertson, to pay him "his share of all oil, bone, &c., turned out by the ship Samuel Robertson."

The Samuel Robertson did not return to the island; but the Arab, in her stead, sailed from Fairhaven on the 14th day of September, 1858, and arrived at the island in due time, and remained until she had obtained a full cargo of oil, when she and the Oxford, with the libellants on board, sailed for the United States, where they arrived in April last.

Several questions have arisen, as to the amount which the libellants are entitled to recover. If their claim is governed by the express terms of the articles, they would each be entitled to only such proportion of one two-hundredth part of seventy per cent. of the proceeds of that voyage, as the time they served the Samuel Robertson bore to the whole time she was absent from Fairhaven; the time of such service being about nine months, and the time of such absence being about twenty-six months. This would give them about five dollars a month, and leave them somewhat in debt to that ship, for clothing and other necessaries. But it is urged, that the order given by the master, on the 10th of May, is for their share of all oil, bone, &c., and that this means that they were to have one two-hundredth of the whole proceeds, and not of seventy per cent., for a part of the time, as stated in the articles. This construction cannot be maintained. The order says nothing of one two-hundredth or of a seventieth, but merely directs the owner to pay each libellant his share of all the proceeds, &c. In order to ascertain his share, we must look at the articles, and there we find that it is one two-hundredth of seventy per cent., reckoned in proportion to the time of service. It is insisted that the libellants are not bound by the terms of the articles, and the order founded thereon.

It is quite clear, that the new and peculiar clause in the articles was not obligatory upon them, because it was never made known to them. But previously to the 10th of May, 1858, they had become acquainted, both with the character of the enterprise, and the terms of the articles. They then received their discharge from the Samuel Robertson and accepted the order given by the master on the owner, and signed the new articles for the ship Arab. The agreement by which they were discharged from the first ship, was a new contract, as was also that by which they engaged in the service of the second ship; and if these contracts were entered into voluntarily, and understandingly, for an adequate consideration, they were binding upon the seamen. But it is contended, that they were not made voluntarily. By their original shipment, the libellants had a right to continue with the Samuel Robertson, and return with her to the United States; and there is evidence that they claimed that right, and that the master refused to permit them to do so, but insisted, even with threats of violence, that they should remain with the Oxford, and continue their labors for the ship that was to make the second voyage. The circumstances of this case render this evidence entirely credible.

In May, when the Samuel Robertson was about to leave, these men had been more than six months at the island, and had become fully acquainted with the nature of the service into which they had been drawn. The sea-elephants were killed by spears, on various parts of the island, whose name—Desolation—fitly describes its condition; encompassed by floating ice; and after taking the blubber from the animal, wherever killed, it was carried by the men, on their backs, over blocks of ice, and other impediments, with great toil and exposure, to their hut on shore; and then, either the blubber preserved, or the oil extracted, and put into casks. With no comforts or provisions, except what the little schooner, or their hut on shore, afforded, and subjected to such severe and repulsive labor, it is not easily

to be believed, that these young men, natives of Fayal, who had previously known only the fruitful soil and genial climate of the Azores, would have consented to see the ship depart, and continue such services for the uncertain period of the return of another ship.

I am fully satisfied that the whole arrangement, by which they were discharged from the Samuel Robertson, and entered into the service of the Arab, was made under duress. They were in the power of the master of the Samuel Robertson; and the option of coming in that ship to the United States was not allowed to them. They have a right, therefore, to set aside the agreement made at Desolation Isle, and are entitled to recover a quantum meruit for their services, from the time they shipped at Fayal, until the time of their discharge in the United States, to be apportioned in these two actions, according to the time they served for each of the ships.

The libel makes no claim for a wrongful discharge from the first voyage, but asks only compensation for services rendered.